UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| D. C., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-21 |
| | § | |
| KLEIN INDEPENDENT SCHOOL DISTRICT, | § § § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM OPINION AND ORDER**

This case arises under the Individuals with Disabilities Education Act ("IDEA"). *See* 20 U.S.C. § 1400, *et seq*. Pending before the Court is the plaintiffs' motion for a stay-put injunction under 20 U.S.C. § 1415(j) and 34 C.F.R. § 300.518. The primary issue governing disposition of the motion is whether the appropriate stay-put placement (referred to in the statutes and regulations as the "current educational placement") includes a dyslexia intervention program ("DIP") or other dyslexia services for Plaintiff D.C.

Having reviewed the relevant administrative decision, the pertinent caselaw, and the parties' well-briefed arguments,[1] the Court concludes that D.C.'s current educational placement does not include the DIP or any other dyslexia intervention services. It is true that, when D.C.'s due process hearing under 20 U.S.C. § 1415(f) was conducted, his individualized education program ("IEP") included placement in the DIP as a student

---

[1] In addition to the parties' presentations at oral argument, the Court has considered all of the parties' briefing, including their post-hearing supplemental briefing (Dkt. 5, 9, 10, 30, 31-1). The plaintiffs' motion to file a supplemental brief (Dkt. 31) is **GRANTED**.

with dyslexia. However, the due process hearing officer concluded that the evidence did not support D.C.'s classification as a dyslexic student and that D.C. derived minimal educational benefit from the DIP (Dkt. 1-1 at pp. 28–31). Accordingly, the plaintiffs' stay-put motion (Dkt. 5) is **GRANTED** to the extent that it seeks an injunction requiring the defendant, Klein Independent School District ("KISD" or "the District"), to implement the specific orders contained in Section X of the hearing officer's opinion during the pendency of this lawsuit. The motion is **DENIED** to the extent that it requests any other relief, including an injunction requiring KISD to implement any dyslexia intervention program.

**I. DYSLEXIA SERVICES ARE NOT PART OF D.C.'S CURRENT EDUCATIONAL PLACEMENT.**

The parties agree that, under 34 C.F.R. § 300.518(d), the hearing officer's decision determines the appropriate stay-put placement (Dkt. 5 at p. 10; Dkt. 9 at p. 9); and the Court agrees with the parties' reading of that regulation. Where the parties diverge is on the question of whether the hearing officer meant to order the District to continue D.C.'s placement in the DIP.

The hearing officer's decision explicitly sets out the following parameters:

1. The District shall convene an [Admissions, Review & Dismissal, or "ARD"] meeting within 30 school days of the issuance of this decision.

2. At the ARD meeting, the District shall modify [D.C.'s individualized education program, or "IEP"] in accordance with the District's [Full and Individual Evaluation, or "FIE"] to indicate [D.C.] is eligible for special education as a student with a Specific Learning Disability in reading comprehension, with specific

weaknesses in comprehension/knowledge, fluid reasoning, long term memory, and processing speed.

    3.      The District shall provide [D.C.] in his IEP 45 minutes per day of reading instruction focused on reading comprehension and related skills using Read 180 or another peer-reviewed program on which the District and [D.C.'s] parents agree. Instruction shall be provided in a one-on-one setting or in a group of no more than six students at least four school days per week, with the exception of weeks which have fewer than four school days. Extended School Year (ESY) services are neither required nor prohibited by this Order. This shall remain in effect for one calendar year from the date on which the ARD Committee meeting is held, unless [D.C.'s] parents and the District agree to a different arrangement.

    4.      The District shall provide [D.C.] an additional 108 hours of compensatory education in a one-on-one setting focused on reading comprehension and related skills using Read 180 or another peer-reviewed program on which the District and [D.C.'s] parents agree. At the ARD Committee meeting, the District and [D.C.'s] parents shall agree on a schedule for providing these compensatory services.

All other requests for relief not specifically stated in these Orders are hereby DENIED.
Dkt. 1-1 at pp. 39–40.

Plaintiffs contend that, because the hearing officer's opinion did not expressly order the District to discontinue D.C.'s DIP placement, "the hearing officer was simply *adding* services (for reading comprehension), not deleting or substituting them" (Dkt. 31-1 at p. 3) (emphasis in original). Plaintiffs go on to argue that, "[g]iven the lack of any explicit order from the hearing officer to cease, stop, or end the dyslexia services, the Court simply cannot rely on the hearing officer's order to cease the services during the pendency of the litigation" (Dkt. 31-1 at p. 3). In effect, Plaintiffs argue that the hearing

officer implicitly ordered the District to continue the dyslexia services by not explicitly ordering the District to discontinue the dyslexia services.

The Court disagrees. Although analogous cases seem to be rare, generally, in "cases where a court implie[s] a 'current educational placement' [in the context of a stay-put motion], the court or agency below ha[s] *expressly* deemed the . . . placement [requested in the stay-put motion] appropriate." *L.M. v. Capistrano Unified School District*, 556 F.3d 900, 903 (9th Cir. 2009) (emphasis added). A close reading of the hearing officer's opinion in D.C.'s case reveals that the hearing officer did not expressly deem dyslexia services appropriate for D.C. Rather, the hearing officer specifically found that no evaluation data supported D.C.'s classification as a dyslexic student and that D.C. derived minimal educational benefit from the DIP. Particularly compelling is the hearing officer's finding that the District's plan for D.C. was inadequate precisely because, at the behest of D.C.'s parents and aunt, the District implemented a plan for D.C. that addressed dyslexia instead of reading comprehension—even though the District's own assessments indicated that D.C. needed a plan that focused on reading comprehension:

> The District assessed [D.C.] and found him to be a student with a Specific Learning Disability in the area of reading comprehension, with specific weaknesses in comprehension/knowledge, fluid reasoning, long term memory, and processing speed.
>
> . . .
>
> However, at the ARD meeting on February 7, 2018, [D.C.'s] aunt convinced the District to adopt the view that [D.C.'s] primary area of need was in the area of Dyslexia. No evaluation data supported identifying [D.C.] as a student with Dyslexia. The District's FIE, [D.C.'s parents'] expert, and [D.C.'s parents'] outside Dyslexia services provider all did not identify [D.C.] as a student with Dyslexia.

The only specialized reading program the District recommended for [D.C.] was DIP, which is a general education Dyslexia intervention program that did not address [D.C.'s] reading comprehension issues.

. . .

[D.C.'s] aunt insisted that [D.C.] had Dyslexia and required a Dyslexia intervention program. The evidence did not support that conclusion. The District was aware that evaluation data, classroom observation, and five school years of experience working with [D.C.] supported [D.C.'s] needing a program to address reading comprehension. The District nevertheless implemented a Dyslexia intervention program. The result of this was that the District's program did not sufficiently address [D.C.'s] area of need in reading comprehension.

The District should be commended for its desire to maintain a positive and collaborative relationship with [D.C.'s] parents. The District also knew that the Dyslexia program would not harm [D.C.]. However, [D.C.] needs a program with a focus on reading comprehension to receive a [Free Appropriate Public Education]. By giving a veto power to [D.C.'s] parents and [D.C.'s] aunt, the District failed to include the opinions of school staff who work with [D.C.] daily. They also ignored the expertise of their own diagnostician, who could not even fully present her own opinions due to the contentious nature of the ARD Committee meetings. The District gave a "veto power" to [D.C.'s] parents at the expense of the other key stakeholders.

. . .

[T]he evidence showed [D.C.] did not derive sufficient academic benefit from his program [and] that [D.C.] made minimal progress in reading, [D.C's] primary area of need.

. . .

[T]he District provided a program that was not individualized on the basis of assessment and performance and ignored input from the key stakeholders other than [D.C.'s] parents and [D.C.'s] aunt. The District failed to address [D.C.'s] reading comprehension deficit adequately in its proposed program. The District's failure to address that deficit sufficiently, the deficit by reason of which [D.C.] qualifies for special education, is the most important factor in the Hearing Officer's analysis. Therefore, the Hearing Officer

> concludes that the District did not provide [D.C.] a [Free Appropriate Public Education].
> Dkt. 1-1 at pp. 28–31.

The Court does not read the hearing officer's opinion to require the District to continue dyslexia services for D.C. While it is true that the hearing officer did not explicitly order the District to discontinue those dyslexia services, the best that the hearing officer could say about providing dyslexia services to D.C. was that the services did not harm him. An isolated observation that dyslexia services did not in and of themselves harm D.C. falls far short of an express statement that dyslexia services were appropriate for him, especially in light of the hearing officer's specific findings that no evaluation data supported D.C.'s classification as a dyslexic student; that D.C. derived minimal educational benefit from the DIP; and that D.C. needed a program focused on reading comprehension and related skills, such as Read 180 or another peer-reviewed program. In short, the hearing officer's statements regarding dyslexia services for D.C. were not sufficient to make dyslexia services part of D.C.'s current educational placement for stay-put purposes. *See Leonard v. McKenzie*, 869 F.2d 1558, 1563–64 (D.C. Cir. 1989) (holding that a private school placement was not a student's current educational placement for stay-put purposes when the hearing officer had allowed the student to finish a prior school year in the private school placement because of procedural violations committed by the school district but had only expressly found public school placement appropriate for the student); *Zvi D. v. Ambach*, 694 F.2d 904, 907–08 (2d Cir. 1982) (same).

## II. CONCLUSION

The plaintiffs' stay-put motion (Dkt. 5) is **GRANTED** to the extent that it seeks an injunction requiring the defendant, Klein Independent School District, to implement the specific orders contained in Section X of the hearing officer's opinion during the pendency of this lawsuit. The motion is **DENIED** to the extent that it requests any other relief, including an injunction requiring Klein Independent School District to implement any dyslexia intervention program.

SIGNED this day 15th day of October, 2019.

_____
George C. Hanks Jr.
United States District Judge