United States District Court
Southern District of Texas
**ENTERED**
March 16, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| D.C., ET AL., | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:19–CV–00021 |
| | § | |
| KLEIN INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM AND RECOMMENDATION**

Plaintiffs J.C. and K.C., as parents, guardians and next friends of D.C., a minor child (collectively, "Plaintiffs"), filed this lawsuit seeking to require Defendant Klein Independent School District ("KISD") to pay attorney's fees and reimburse certain costs after Plaintiffs received a favorable decision in an administrative hearing pursuant to the Individuals with Disabilities Education Act ("IDEA"). Before me are competing motions: Plaintiffs' Motion for Judgment Affirming the Hearing Officer and for Attorney's Fees (Dkt. 16); and KISD's Motion for Summary Judgment. Having considered the motions, responsive briefing, record, and applicable law, I **RECOMMEND** that Plaintiffs' Motion for Judgment Affirming the Hearing Officer and for Attorney's Fees (Dkt. 16) be **GRANTED** with the modifications discussed below and KISD's Motion for Summary Judgment (Dkt. 17) be **DENIED**.

## BACKGROUND

When this lawsuit was filed, D.C. was an 11-year-old sixth grader enrolled at Hofius Intermediate School in KISD.  To put the facts into proper perspective, I provide a brief history of D.C.'s elementary school education.

D.C. entered first grade at KISD's Metzler Elementary in the fall of 2013.  D.C.'s first grade teacher placed him in the Tier 2 Response to Intervention ("RTI") program to work on his reading fluency.  Tier 2 RTI consisted of the first-grade teacher working with a group of four or five students for 45 minutes per day outside of classroom instruction time.

In second grade, D.C. continued to receive Tier 2 RTI services.  His grades in reading, writing, and math were all at least 80 in each grading period throughout the year.  That being said, D.C. performed a full grade level below his peers on the KISD reading assessment.

D.C. remained in Tier 2 of the RTI program in third grade.  Although he passed the State of Texas Assessment of Academic Readiness Exam ("STAAR") exam in all areas, he struggled mightily with reading comprehension.  In the spring of his third-grade year, D.C. was placed in a Section 504 plan[1] for reading difficulty.  The Section 504 plan documented that D.C. had a reading fluency level of kindergarten or below, but it did not include any direct instruction for D.C. in reading fluency or comprehension.  In the fall of D.C.'s third-grade year, his mother requested a Full Individual Evaluation ("FIE") to

---

[1] A Section 504 plan is a plan developed to ensure that a child who has a disability and is attending an elementary or secondary educational institution receives accommodations that will facilitate his academic success and access to a learning environment.  *See* 29 U.S.C. § 794.

determine if D.C. qualified for special education and related services as a student with a specific learning disability.

In fourth grade, the 2016–2017 school year, D.C. encountered additional problems with fluency and reading comprehension. He did not meet any reading, writing, or science benchmark assessments on his standardized tests. His reading ability was so poor that he failed the STAAR exam and scored in the bottom two percentile on the reading portion of the Measure of Academic Proficiency exam. In contrast to his test scores, D.C. performed relatively well in his grade-level curriculum with all passing grades—79 in reading and all Bs in the remaining courses.

D.C. continued to struggle in the fifth grade, the 2017–2018 school year. Even so, KISD did not conduct a FIE until January 2018, the middle of D.C.'s fifth-grade year, and only after his parents requested an evaluation. The evaluation indicated that D.C.'s reading comprehension score placed him at just the eighth percentile level. D.C. was found eligible for special education as suffering from a specific learning disability in reading comprehension, with specific weaknesses in comprehension/knowledge, fluid reasoning, long term memory, and processing speed.

After several lengthy hearings with D.C.'s family, KISD implemented an Individualized Education Program ("IEP") on March 9, 2018. As part of the IEP, D.C. received 3.75 hours of "co-teach" instruction and 30 minutes of dyslexia services per week.

## THE HEARING OFFICER'S DECISION

Dissatisfied with the IEP put in place by KISD, Plaintiffs filed a request for an impartial due process hearing with the Texas Education Agency.  After the four-day evidentiary hearing that followed, the special education hearing officer made a number of findings, including the following:

- D.C. was not dyslexic and was not in need of dyslexia related services.

- KISD's attempt to collaborate with the family in providing dyslexia services, without properly addressing D.C.'s reading comprehension disability, denied D.C. a Free Appropriate Public Education ("FAPE").

- KISD failed to timely find and provide D.C. with the special education services he needed to have a beneficial educational opportunity.

- The IEP did not address D.C.'s reading comprehension difficulties.

- KISD had reason to suspect D.C. had a learning disability by April 27, 2017, the spring of his fourth-grade year.

- D.C.'s IEP was not sufficiently individualized or effective.

As a consequence of the delay in evaluation and the inappropriate IEP, the hearing officer ordered KISD to convene to: (1) specifically identify the disability in reading comprehension; (2) provide for 45 minutes per day, four days per week, of reading instruction in a small group with a reading program designed to address reading comprehension deficits; and (3) schedule 108 hours of compensatory educational services in a one-on-one setting.  The hearing officer also ordered the district to "modify [D.C.'s] IEP in accordance with the District's FIE to indicate [D.C.] is eligible for special

education as a student with a Specific Learning Disability in reading comprehension, with specific weaknesses in comprehension/knowledge, fluid reasoning, long term memory, and processing speed." Dkt. 1-1 at 39.

This lawsuit followed, with Plaintiffs asking the Court to order KISD to pay attorney's fees and reimburse certain costs as a result of Plaintiffs prevailing in the administrative hearing.   KISD filed a counterclaim, contending that D.C. is not a prevailing party because the hearing officer's decision is erroneous and should be reversed as to the finding that the IEP was inappropriate and that D.C. was entitled to any compensatory services.

## STANDARD OF REVIEW

Under the IDEA, "[a]ny party aggrieved by the findings and decision" of an administrative hearing officer may bring suit in district court.  20 U.S.C. § 1415(i)(2)(A). When a court reviews a hearing officer's decision under the IDEA, "the court must receive the record of the administrative proceedings and is then required to take additional evidence at the request of any party." *Cypress-Faribanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997).  Although due weight is to be given, the hearing officer's findings are not conclusive.  *See Bd. of Educ. Of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  Instead, I must conduct a virtually *de novo* review in which I review "legal questions *de novo* and factual questions for clear error." *Spring Branch Indep. Sch. Dist. v. O.W.*, 938 F.3d 695, 703–04 (5th Cir. 2019) (quoting *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017)).  "Mixed questions should be reviewed under the clearly erroneous standard if factual questions

predominate, and *de novo* if the legal questions predominate." *Id*. at 704 (quoting *Seth B. v. Orleans Parish Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016)). Relevant here, determinations of whether a school district failed to provide a FAPE "or failed to comply with its child find duty in a timely manner are mixed questions which [I] review de novo." *Id*.

Ultimately, I must "reach an independent decision based on a preponderance of the evidence." *Woody*, 865 F.3d at 309 (quoting *Michael F.*, 118 F.3d at 252). This standard, however, "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *R. S. v. Highland Park Indep. Sch. Dist.*, ___ F.3d. ___, 2020 WL 914703, at *5 (5th Cir. Feb. 26, 2020) (quotation marks and citation omitted).

Although presented as summary judgment motions, the motions filed by Plaintiffs and KISD are "not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *E. R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018) (quoting *Seth B.*, 810 F.3d at 966–67). *See also C. G. v. Waller Indep. Sch. Dist.*, No. 4:15-CV-00123, 2016 WL 3144161, at *5 (S.D. Tex. June 6, 2016) ("If no party requests additional evidence to be heard by the district court, a motion for summary judgement [sic] is simply a procedural device for asking the Court to decide the case on the basis of the administrative record.") (internal quotation marks and citation omitted).

KISD carries the burden of proof as the party appealing the hearing officer's decision.  *See Seth B.*, 810 F.3d at 972 (The district court "did not err in allocating appellants the burden of persuasion.").

## DISCUSSION

The primary purpose of the IDEA is to ensure that children with disabilities receive a FAPE in the least restrictive environment possible.  *See White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 378 (5th Cir. 2003).  A FAPE consists of "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *Rowley*, 458 U.S. at 203.  To that end, school districts must develop an IEP for each child with a disability.  *See* 20 U.S.C. §1414(d).  The IEP is a written statement that specifies the special education and related services the child needs to receive a FAPE and outlines how those services will be delivered to the child.  *See Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 209 (5th Cir. 2019).  The IEP is the primary vehicle required to affect the congressional goals under the IDEA.  *See Honig v. Doe*, 484 U.S. 305, 311 (1987).

This case requires me to address two related, but separate questions: First, did KISD satisfy its child find duty?  Second, was the IEP implemented by KISD reasonably calculated to provide meaningful educational benefits under the IDEA?  I will address each issue separately.

## A.    KISD VIOLATED ITS CHILD FIND DUTY

The IDEA's child find requirement obligates public school districts to identify, locate, and evaluate students with suspected disabilities "within a reasonable time after

the school district is on notice of facts or behavior likely to indicate a disability." *Woody*, 865 F.3d at 320.  "An unreasonable delay in complying with this duty may constitute a procedural violation of the IDEA." *Krawietz v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018) (internal quotation marks and citation omitted).  "A finding of a child find violation turns on three inquiries: (1) the date the child find requirement triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates." *O.W.*, 938 F.3d at 706.

### 1.      The Date the Child Find Duty was Triggered: April 27, 2017

The relevant window for purposes of assessing any alleged delay in a school district's compliance with its child find obligation begins when a school district has notice of a child's disability and potential need for special education services.  *See Woody*, 865 F.3d at 320.  Here, the hearing officer found that KISD had notice that D.C. needed special education and related services by, at the latest, April 27, 2017.[2]  The hearing officer provided the following reasoning as the basis for his finding:

> [D.C.] had been receiving Section 504 services since he was in third grade, so the District was aware [D.C] had a disability. . . .  [D.C.] began the 2016–17 school year on Reading Level O and did not improve his reading during the course of the year.  By the middle of the year, his MAP score placed him in the second percentile in reading for his age group, which was consistent with his classroom performance.  [D.C.] failed his Reading STAAR test in the spring of 2017 and performed at a low level on the District-wide assessments throughout the year.

---

[2] The hearing officer did not choose an earlier date because April 27, 2017 was one year prior to the parents' request for a due process hearing, the earliest possible date from which D.C. could recover under the applicable statute of limitations.  *See R. S.*, 2020 WL 914703, at *5.

Dkt. 1-1 at 26.

KISD argues that it did not suspect D.C. needed special education services by April 27, 2017 because the results of the STAAR test were actually not released until June 2017 and D.C.'s fourth grade reading fluency examinations show steady improvement throughout the year. I am not persuaded.

After carefully reviewing the voluminous administrative record, I find that the hearing officer did not clearly err in finding that KISD had notice of D.C.'s suspected disability by April 27, 2017.[3] It is true that D.C. enjoyed a slight reading fluency improvement in fourth grade, and I fully appreciate that KISD did not know about the results of the STAAR test in April 2017. However, the hearing officer "did not rely on the [STAAR results] alone; [he] relied on a combination of factors." *Krawietz*, 900 F.3d at 677. There is considerable evidence in the record to support the hearing officer's finding that KISD should have suspected D.C.'s need for special education services by April 27, 2017, at latest. *See* AR[4] 399, 402 (In D.C.'s fourth-grade Section 504 plan, effective March 9, 2017, D.C. was found to have a mental impairment that substantially limited his ability to read, concentrate, learn, and think, and the plan specifically noted that D.C. had "secondary characteristics of dyslexia in reading comprehension and

---

[3] I review this notice question under the clearly erroneous standard because it is a question of fact underlying the ultimate question of whether KISD violated its child find duty. *See O.W.*, 938 F.3d at 704 ("The underlying factual determinations are reviewed for clear error.").

[4] The administrative record is 3,730 pages long and was provided to the Court on a zip drive. *See* Dkts. 12, 41. The zip drive is held by the Clerk of the Court. For convenience sake, I will refer to pages referenced in the administrative record as "AR pg. #."

written expression."); AR 401 ("At the beginning of [fourth grade] he was reading at Level O, and remains at the same level mid-year. . . .  Both teachers have been providing oral administration to [D.C] and shared that there is a significant discrepancy when he is given an assignment with oral administration than without."); AR 420 (In D.C.'s third-grade Section 504 plan, effective March 22, 2016, D.C. was found to have a mental impairment that substantially limits his ability to read, concentrate, learn, and think.); AR 422 (The Section 504 Student Review Committee found that "the student has evidence of reading difficulty."); AR 412–417, 431–434 (Samples of D.C.'s school assignments from fourth grade showed that D.C. was able to score 72–100 percent when staff read assignments to him but only 30–50 percent when he was relying on his own ability to read.); AR 2043 (By the middle of fourth grade, D.C.'s standardized test score placed him in the bottom second percentile in reading for his age group.); PE[5] 47, April 19, 2018 Audiotape at 6:00–6:30, 7:20–7:35, 8:45–9:15 (During the IEP meeting on April 19, 2018, Special Education Director, Lauren Ivins-McFarland, stated multiple times that KISD should have referred D.C. for a special education evaluation by "mid-year fourth grade.").  The evidence shows that KISD had notice of facts and behavior likely to indicate that D.C. had a reading disability by, at the latest, April 27, 2017.

KISD asserts that the trigger date did not begin until September 6, 2017, the day that D.C.'s parents allegedly requested that D.C. undergo a disability evaluation.  I do not

---

[5] D.C. submitted various audio recordings from the IEP hearings along with the administrative record.  *See* Dkts. 12, 41.  These recordings can be found on the same zip drive as the administrative record in a folder titled "P. Ex. 47."  Because there are multiple recordings in the folder, I refer to the specific segments of the recordings using the specific date and time segment of the particular recording.

agree.  A child's right to a FAPE does not depend on the vigilance of the parents; child find is the responsibility of the school district.  *See Krawietz*, 900 F.3d at 677.  KISD should have proactively sought to evaluate D.C. for special education eligibility as soon as it was on notice of a likely disability irrespective of whether the parents ever requested an evaluation.  Accordingly, I find that the hearing officer did not clearly err in finding that KISD had notice by April 27, 2017.

### 2.    The Date the Child Find Duty was Satisfied: October 19, 2017

The date D.C.'s parents provided consent to allow a disability evaluation—October 19, 2017—is the end date of the reasonableness inquiry.  *See O.W.*, 938 F.3d at 706 ("[T]he January 15, 2015, referral for evaluation represents the appropriate end date for the reasonableness inquiry.").

### 3.    The Period of Delay Between April 27, 2017, and October 19, 2017, Was Unreasonable

The ultimate question is whether the delay between April 27, 2017, and October 19, 2017, was reasonable.  *See id*.  The Fifth Circuit provides meaningful guidance on this issue:

> [T]he reasonableness of a delay is not defined by its length but by the steps taken by the district during the relevant period.  A delay is reasonable when, throughout the period between notice and referral, a district takes proactive steps to comply with its child find duty to identify, locate, and evaluate students with disabilities.  Conversely, a time period is unreasonable when the district fails to take proactive steps throughout the period or ceases to take such steps.

*Id*. at 707.

In this case, KISD has presented no evidence that it took any proactive steps to comply with its child find duty from April 27, 2017, through September 2017, when KISD responded to D.C.'s mother's request for a meeting with school officials. KISD maintains that it took reasonable, proactive steps by gathering, reviewing, and summarizing D.C.'s academic performance data in September 2017 to determine whether a special education referral was appropriate. In my view, the four-month delay between April 2017 and September 2017 is completely unreasonable, especially when D.C.'s mother had requested back in the fall of 2015 that KISD undertake a special education evaluation of D.C. *See Krawietz*, 900 F.3d at 677 (holding that a four-month delay was unreasonable because the school district "failed to take any appreciable steps toward complying with its Child Find obligation."). It is also disconcerting that, although D.C.'s parents requested a FIE in September 2017, they had to follow-up several times on that request before KISD finally decided to conduct a FIE. KISD did ultimately seek consent from D.C.'s parents on October 19, 2017, the 30th school day following the parents' request. This hardly demonstrates proactive conduct on behalf of KISD, especially when state law provides that KISD had 15 school days to provide the parents the opportunity to consent to an evaluation or provide written notice of a refusal to evaluate. *See* 19 TEX. ADMIN. CODE § 89.1011(b).

At oral argument, KISD's counsel argued that the school district should not be held responsible for its failure to act during the summer months when school was out of session. This argument is, in my view, a red herring. By April 27, 2017, KISD was on notice of D.C.'s disability and potential need for special education services, yet the

school district did absolutely nothing proactive through the end of the school year.  Given that this was the first time D.C. would participate in a special education evaluation and his mother had previously requested an evaluation, KISD could have—and should have—promptly taken action.  Instead, KISD did nothing of the sort.  To the extent KISD claims that the response to intervention strategies it utilized during D.C.'s elementary school education constitutes proactive steps sufficient to satisfy its child find obligations, the Fifth Circuit has soundly rejected that argument.  *See O.W.*, 938 F.3d at 707; *Lisa M.*, 924 F.3d at 209 n.4.

KISD next argues that, even if it did violate its child find duty, the error was harmless.[6]  I am not persuaded.  A child experiences an "egregious loss of educational opportunity" when the child "is erroneously denied eligibility for special education services." *Michael P. v. Dept. of Educ.*, 656 F.3d 1057, 1068 (9th Cir. 2011).  *See also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009) ("It would be particularly strange for the [IDEA] to provide a remedy, as all agree it does, when a school district offers a child inadequate special-education services but to leave parents without relief in the more egregious situation in which the school district unreasonably denies a child access to such services altogether.").  In this case, D.C. should have been referred for a disability evaluation six months earlier.  Had the disability evaluation been conducted in a timely manner, D.C. would have received disability services at a much earlier date.  Since the entire purpose of the IEP is to enable the child to receive educational benefits as

---

[6] I find it ironic that KISD argues here that implementing the IEP in fourth grade rather than fifth would not have made any difference when KISD also argues in the same motion that the IEP implemented in fifth grade led to significant improvement in D.C.'s reading ability.

promptly as possible, I find that the six-month delay here is significant and meaningful. The net effect of KISD's violation of its child find duty is that D.C. has been denied a FAPE.

***

In sum, I find that KISD failed to meet its child find obligations, resulting in the loss of educational opportunity.  Plaintiffs are, therefore, entitled to relief.

## B. THE IEP DEVELOPED BY KISD WAS NOT REASONABLY CALCULATED TO RESULT IN MEANINGFUL EDUCATIONAL BENEFITS

"To ensure that a child receives a FAPE, parents and school districts collaborate to develop an [IEP] that is 'reasonably calculated to enable the child to receive educational benefits.'" *See C. G.,* 2016 WL 3144161, at *5 (quoting *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010)).  The IEP must be specifically designed to meet the unique needs of a particular child with a particular disability at no cost to parents.  *See* 20 U.S.C. § 1401(29); *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  An IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction."  *Michael F.*, 118 F.3d at 247–48 (quoting *Rowley*, 458 U.S. at 188–89).  For an IEP to be tailored to a child's unique needs, it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999.  "[T]he question is whether the IEP is *reasonable*, not whether the court regards it as ideal."  *Id*.

The reasonableness of an IEP is reviewed *de novo* as a mixed question of law and fact.  *See A.A. v. Northside Indep. Sch. Dist.*, ___ F.3d. ___, 2020 WL 1073064, at *3 (5th Cir. Mar. 6, 2020).  "Decisions such as if a student obtained an educational benefit from a school's special education services are underlying findings of fact," which are reviewed for clear error.  *Id.*

To determine whether the IEP is reasonable, I must apply the four-factor test established by the Fifth Circuit two decades ago in *Michael F*, 118 F.3d at 253. Accordingly, to determine whether a child's IEP is substantively compliant with the IDEA, I must consider whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program constitutes the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated."  *Id*.  These factors "serve as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA."  *E. R.*, 909 F.3d at 765.  I address each factor below.

### 1.  KISD Denied D.C. an Individualized IEP

The first *Michael F.* factor asks whether the school district designed an IEP that is individualized based on the student's assessment and performance to meet the child's unique needs.  *See Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347–48 (5th Cir. 2000); *Michael F.*, 118 F.3d at 253.  An IEP need not provide every conceivable support or service necessary to assist the child to reach his potential.  *See Rowley*, 458 U.S. at 199.  Rather, the focus is on "the whole educational experience, and its adaptation to

confer 'benefits' on the child." *KISD Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 397 (5th Cir. 2012).

KISD assessed D.C. and found him to be a student with a specific learning disability primarily in reading comprehension.  KISD had an affirmative duty to craft an IEP that would specifically address D.C.'s difficulties with reading comprehension.  The hearing officer found that KISD failed to design an IEP appropriately individualized to meet D.C.'s unique needs because the IEP did not include any means to remedy D.C.'s reading comprehension deficits.  I concur.

As part of the IEP, KISD placed D.C. in a co-teach program which provided him one-on-one assistance for up to 3.75 hours per week.  The co-teach program allows a second teacher to enter the classroom in order to assist eligible students in completing their assignments.  The program is not specifically designed to assist in the development of reading comprehension.  Because the limited time the co-teachers had with D.C. was spread across all of D.C.'s various subjects and the co-teachers often split a student's time helping numerous eligible students in any particular classroom, the amount of time the co-teachers spent helping D.C. work on his reading comprehension is undeterminable.  As a result, I agree with the hearing officer that placement in the co-teach program was an effort to accommodate but not remediate D.C.'s reading comprehension disability.

In addition to the co-teach program, KISD placed DC in a dyslexia intervention program in which he was provided dyslexia related services and tutoring for 30 minutes per week.  The hearing officer found that, although innocuous, this program failed to address D.C.'s difficulties in reading comprehension because there was no evidence that

D.C. suffered from dyslexia.  KISD had no credible evidence that D.C. suffered from dyslexia.  The only reason the dyslexia services were provided was because of the demands made by D.C.'s family, who were under the mistaken belief that D.C.'s reading difficulties were a result of dyslexia.  The dyslexia program was not designed to improve the reading comprehension of those who do not have dyslexia.  KISD's own expert, Dr. Margaret McKinney, agreed that the dyslexia services would not meet D.C.'s unique needs.  *See* AR 3631 ("I don't think that a dyslexia intervention in and of itself is going to assist [D.C.] with the end game of reading . . . comprehension.").

In sum, KISD failed to design an IEP that was appropriately individualized to address D.C.'s unique needs in reading comprehension.  As a result, this factor weighs in D.C.'s favor.

### 2.    The Least Restrictive Environment Factor Is Neutral

The parties agree that it is irrelevant whether the IEP was administered in the least restrictive environment under the facts of this case.  Therefore, this factor is neutral.

### 3.    Services were Provided in a Coordinated and Collaborative Manner

The third factor considers whether the key stakeholders provided the services in a coordinated and collaborative manner.  *See Michael F.*, 118 F.3d at 253.  "The IDEA contemplates a collaborative process between the district and the parents." *E.R. v. Spring Branch Indep. Sch. Dist.*, No. 4:16-CV-0058, 2017 WL 3017282, at *27 (S.D. Tex. June 15, 2017).  The child's parents, however, do not have the right to dictate an outcome because parents do not possess veto power over a school district's decisions.  *See White*, 343 F.3d at 380.  Absent bad faith exclusion of a student's parents or refusal to listen to

them, a school district must be deemed to have met the IDEA's requirements regarding collaboration with a student's parents. *See id*.

D.C.'s family insisted that D.C. had dyslexia and demanded that the IEP include dyslexia services despite there being no credible evidence that D.C. had dyslexia.  The hearing officer found that the IEP was not provided in a collaborative manner because KISD simply acceded to the parent's demands instead of collaborating with the family to determine what would best address D.C.'s particular needs.  I disagree with this finding.

Although it is true that KISD accepted the family's demands concerning the inclusion of the dyslexia services, it is clear, looking at the IEP's development and execution as a whole, that collaboration permeated the process.  KISD held three lengthy IEP hearings with D.C.'s family in order to work together to develop the IEP.  Even those present at these meetings characterized the process of developing the IEP as being collaborative, including D.C.'s own mother.  *See* AR 3438 (Committee member stated, "I have never been in a more collaborative [IEP development process] than this one. . . . [E]verything was talked out.  It was discussed.  It was questioned.  Repeated.  Questioned and repeated and discussed, argued, defended.  And yeah, collaboratively it happened."); AR 3123 (D.C.'s mother agreed that "it was a collaborative process.").  The mere fact that KISD deferred to the parents and included unnecessary dyslexia services in the IEP does not, in my view, demonstrate a lack of collaboration.  It represents an attempt by KISD to bend over backwards to be accommodating.

Furthermore, there is no allegation—nor evidence—that KISD excluded D.C.'s parents from participating in the IEP formulation process or flat-out refused to listen to

their input.  The IEP development process could have been found to be collaborative for this reason alone.  *See White*, 343 F.3d at 380 ("Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents'] input, [defendant] met IDEA requirements with respect to parental input."); *Blackmon v. Springfield R–XII Sch. Dist.,* 198 F.3d 648, 656 (8th Cir. 1999) (The IDEA requirement of collaboration was satisfied when the school district did not "seriously hamper" the parent's opportunity to participate in the formulation process.).

Accordingly, I find that despite KISD's accession to the demands of D.C.'s family, the services as a whole were provided in a coordinated, collaborative manner. The hearing officer clearly erred in finding otherwise.  *See A.A.*, 2020 WL 1073064, at *3 ("Under clear error review, a factual finding may be reconsidered when, after reviewing all of the evidence, the court is left with the definite and firm conviction that a mistake has been committed.") (internal quotation marks and citation omitted).  Thus, this factor weighs in KISD's favor.

### 4.   The IEP Did Not Meaningfully Benefit D.C. Academically

The fourth factor considers whether there have been demonstrable academic and non-academic benefits resulting from an IEP.  *See Michael F*., 118 F.3d at 253.  The hearing officer found that D.C. obtained a nonacademic benefit from the IEP, but did not derive a sufficient academic benefit from the program.[7]  Whether a student obtained academic benefits from an IEP is a question of underlying fact and is thus reviewed for

---

[7] As far as the nonacademic benefit is concerned, the hearing officer held that "[t]he evidence shows that Student has friends and derives the nonacademic benefit of interacting appropriately with his nondisabled peers and with his teachers and staff."  Dkt. 1-1 at 30–31.

clear error.  *See R. S.*, 2020 WL 914703, at *5.  As the Supreme Court has noted, "[a] student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all."  *Endrew F.*, 137 S. Ct. at 1001 (internal quotation marks omitted).  Hence, a student must receive more than just "some" or "any" educational benefit from the IEP; the educational benefit must be meaningful.  *Id.* at 998.

The IDEA does not entitle a disabled child to an IEP that maximizes his educational performance, but instead only guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction."  *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (quotation marks and citation omitted).  The benefit, however, "cannot be a mere modicum or *de minimis*; rather, an IEP [should] produce progress, not regression or trivial educational advancement."  *Id.*  (quoting *Michael F.*, 118 F.3d at 248).  "In short, the educational benefit that an IEP is designed to achieve must be meaningful."  *Michael F.*, 118 F.3d at 248 (internal quotation marks and citation omitted).

The relevant period of inquiry begins on March 9, 2018, the day the IEP was implemented.  Admittedly, this inquiry is made more difficult by the fact that the IEP was implemented late in D.C.'s fifth-grade year, with little time to make a proper assessment as to the impact of the IEP before the end of the school year.  The hearing officer ultimately concluded that the evidence presented at the administrative hearing demonstrated that D.C. "made minimal progress in reading, [D.C.'s] primary area of

need." Dkt. 1-1 at 31. Based on my careful review of the administrative record, I am unable to find any evidence that the IEP implemented by KISD resulted in a meaningful educational benefit.

Claiming that the IEP did result in a meaningful educational benefit, Defendants point to the following:[8]

- D.C. passed all of his classes in the spring of 2018, including reading.

- D.C. passed all sections of the STAAR examination in April 2018. On the reading section of the STAAR examination, D.C.'s performance improved from the 16th percentile in fourth grade to the 36th percentile in fifth grade.

Although this amounts to some, minimal evidence of improvement, there are several reasons why I find this evidence insufficient to show that D.C.'s reading improvement was more than *de minimus* in light of his circumstances.

First, D.C. passed all of his classes before and after the implementation of the IEP. The Supreme Court has made it clear that passing grades do not alone prove that a child has benefitted from an IEP, especially if the child was already passing before the IEP's implementation. *See Endrew F.*, 137 S. Ct. at 1000 n.2; *Rowley*, 458 U.S. at 203 n.25. Therefore, D.C.'s passing grades cannot alone be an indicator of improvement when there is no evidence that D.C. failed his classes before the IEP's implementation.

Second, if there was any improvement in D.C.'s reading ability, it would be difficult to determine whether the improvement was due to the IEP because D.C. was

---

[8] KISD refers to other evidence of improvement during fifth grade, such as an increase in D.C.'s RIT score, but the evidence is unclear whether the markers of improvement occurred before or after March 9, 2018, the day the IEP was implemented. *See* Dkt. 17 at 23–24. As a result, I will not consider such evidence.

receiving private tutoring all throughout fifth grade. *See C. G.*, 2016 WL 3144161, at *9 ("The Court finds that these [private tutoring services] hamper the Court's ability to analyze the true extent of how [the child] benefited from [the school district's] IEPs."). This is especially true considering that the STAAR examination was administered only one month after the IEP's implementation.   With so little time between the implementation of the IEP and the administration of the STAAR examination, the improvement from D.C.'s fourth grade STAAR results was more likely due to the year of private tutoring rather than one month of the IEP.

Third, D.C.'s improvement on the fifth grade STAAR exam may have been due to the numerous STAAR exam accommodations included in the IEP.   These accommodations included "Extra Time," "Small-Group Administration," and "Oral/Signed Administration: READ ALL Test Questions, Answer Choices, Required Reference Materials, and allowable accommodations" in reading, math, and science. With these additional accommodations, I would expect that D.C.'s test results would improve.  Thus, it is unclear whether I can attribute the change in D.C.'s STAAR results to an improvement in his reading ability resulting from the IEP.

In arguing that D.C. received absolutely no benefit from the IEP, Plaintiffs point to the results of a reading fluency examination in April 2018.[9]  The results of this test show that D.C.'s reading fluency was at 82 words per minute and the expected fluency rate for

---

[9] Plaintiffs rely on other evidence that the IEP did not improve D.C.'s reading ability, such as D.C.'s independent reading level being equated to a third-grade level in February 2018. *See* Dkt. 20 at 34–35.  However, this evidence is irrelevant because it relates to D.C.'s difficulty reading before the relevant period of inquiry began on March 9, 2018.

students in fifth grade is 118–137 words per minute. *See* PE 47, April 19, 2018 Audiotape at 1:27:45–1:28:45. Although this evidence does show that D.C.'s reading fluency was still far below that of his peers after the IEP's implementation, it does not tell me anything about whether there was meaningful improvement, and that is the ultimate issue the fourth *Michael F.* factor requires me to address. The truth of the matter is that D.C.'s performance on fluency exams varied dramatically depending on the day. In fourth grade, D.C.'s fluency score fluctuated between 50 to 100 words per minute. In fifth grade, D.C.'s fluency score was 71 words per minute at the beginning of the year and 75 words per minute by mid-year. In comparing the April 2018 result of 82 words per minute to D.C.'s prior fifth-grade fluency scores, one could find a slight improvement, but there just are not enough data to account for the natural statistical variation in D.C.'s performance.[10] Furthermore, when I compare the April 2018 results to D.C.'s best results at the end of fourth grade, arguably D.C.'s reading fluency was slightly worse after the implementation of the IEP. Thus, this evidence does not weigh in either party's favor.

To recap, the only evidence that purportedly shows the IEP benefited D.C. is the slight improvement in D.C.'s grades and STAAR test results. This evidence is simply insufficient to prove that the hearing officer clearly erred in finding no demonstrable academic benefit. It is important to note that I am not finding that the IEP provided zero benefit to D.C. I am simply concluding that there is not sufficient evidence in the record

---

[10] Even assuming there was a slight improvement in fluency after the IEP's implementation, the question of whether the improvement resulted from the IEP becomes even hazier when taking into account D.C.'s private tutoring.

to indicate that the IEP's 3.75 hours of co-teach instruction and 30 minutes of dyslexia services per week provided a meaningful benefit to D.C.  Because KISD has failed to satisfy its burden, I find that this factor weighs in Plaintiffs' favor.

***

In sum, I find that the hearing officer's only error was his finding of no collaboration between KISD and D.C.'s family.  I find that such error was harmless because two out of three of the relevant factors at issue still weigh in Plaintiffs' favor.  Accordingly, based on my virtually *de novo* review of the administrative record, I find that there is a substantive violation of the IDEA.  KISD has failed to demonstrate by a preponderance of the evidence that the IEP was reasonably calculated to enable D.C. to receive a FAPE.

## C.   ATTORNEY'S FEES

The IDEA provides that "'the court, in its discretion, may award reasonable attorneys' fees as part of the costs' to the parents of a child with a disability who is the prevailing party." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006) (quoting 20 U.S.C. § 1415(i)(3)(B)).  "The district court must determine whether the hours claimed were reasonably expended on the litigation." *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (internal quotation marks and citation omitted).  *See also Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983) ("The district court also should exclude . . . hours that were not reasonably expended.") (internal quotation marks and citation omitted).  A prevailing party may seek attorney's fees for both the

administrative due process proceedings and subsequent litigation in court.  *See El Paso Indep. Sch. Dist. v. Richard R.*, 591 F.3d 417, 422 n.4 (5th Cir. 2009).

Plaintiffs are unquestionably prevailing parties for purposes of awarding attorney's fees.  *See Hensley,* 461 U.S. at 433 ("Plaintiffs may be considered 'prevailing parties' . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.") (quotation marks and citation omitted); *Jason D.W. v. Hous. Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998) ("[A] prevailing party is one that attains a remedy that both (1) alters the legal relationship between the school district and the handicapped child and (2) fosters the purposes of the IDEA."). Thus, Plaintiffs are entitled to a reasonable amount of attorney's fees.  The obvious question then becomes: What amount of attorney's fees is reasonable?

### 1.    The Lodestar

The first step in determining the amount of reasonable attorney's fees is to calculate the lodestar, which is the product of the number of hours reasonably and necessarily expended multiplied by the attorney's reasonable hourly rate.  *See Jason D.W.*, 158 F.3d at 209.  Plaintiffs' counsel, Dorene Philpot ("Philpot"), spent a total of 290 hours working on this case, 287.2 hours which were billed at $325.00 per hour and 2.8 hours which were billed at $150.00 per hour for tasks more appropriately billed as clerk time, resulting in a lodestar amount of $93,760.00.[11]  The parties have stipulated that the hourly rate is reasonable.

---

[11] Some 131.2 hours was spent in trial preparation and document review of over 4,000 pages of production, 92 hours was spent writing the post-hearing brief, and over 30 hours was spent in the

## 2.      Adjusting the Lodestar

The second step is to evaluate whether the lodestar should be adjusted up or down based on consideration of the twelve factors established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[12]  *See Jason D.W.*, 158 F.3d at 209. "[T]he lodestar figure includes most, if not all, of the relevant [*Johnson*] factors constituting a reasonable attorney's fee, and . . . an [adjustment] may not be awarded based on a factor that is subsumed in the lodestar calculation." *Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010) (internal quotation marks and citation omitted).

The Supreme Court has held that a district court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435.  "[I]f a plaintiff has achieved only partial or limited success, the [lodestar] may be an excessive amount." *Farrar v. Hobby*, 506 U.S 103,114 (internal quotation marks and citation omitted).  "This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436.  When a plaintiff only achieves limited success, "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the

---

administrative hearing itself, where there were 18 witnesses.  The remainder of the time Philpot spent attempting to negotiate a settlement, discussing the case with her client, and reviewing 13 tape recordings of the IEP hearings.

[12] The *Johnson* factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *See Johnson*, 488 F.2d at 717–19.

award to account for the limited success." *Hensley*, 461 U.S. at 436–37. "There is no precise rule or formula for making these determinations." *Id*. at 436. Ultimately, adjusting the lodestar is within the sound discretion of the district court. *See U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 475 (5th Cir. 2009) ("Under the abuse of discretion standard, a district court's decision to award attorneys' fees will not be disturbed unless the award is based on (1) an erroneous view of the law or (2) a clearly erroneous assessment of the evidence.") (quotation marks and citation omitted). As the "party advocating the reduction of the lodestar amount," KISD "bears the burden of establishing that a reduction is justified." *Kellstrom*, 50 F.3d at 329 (quotation marks and citation omitted).

Before the hearing officer, Plaintiffs argued extensively that D.C. should be awarded years of compensatory education services because KISD's child find duty had arisen years before KISD finally referred D.C. for a disability evaluation in October 2017. In support of their argument, Plaintiffs presented considerable evidence in the form of witness testimony and exhibits that KISD had notice of D.C.'s suspected disability as far back as 2014. Despite Plaintiffs' arguments, the hearing officer found that the earliest possible date from which Plaintiffs could recover was April 27, 2017, the statute of limitations deadline. Plaintiffs also sought to recover compensatory dyslexia services. The hearing officer ruled against D.C. on his argument that he was dyslexic and, consequently, ordered KISD to remove dyslexia services from D.C.'s IEP. In short, Plaintiffs recovered only a small fraction of the compensatory education services they initially sought.

I, therefore, find that it would be inappropriate for me to award attorney's fees to compensate counsel for the time she spent on developing and presenting evidence for claims that were ultimately time-barred or otherwise unsuccessful.  If I were to award Plaintiffs the full lodestar, the result would be to reward and encourage the prosecution of stale and/or unmeritorious claims.  Nevertheless, Plaintiffs were successful in acquiring an order to change the IEP and more than six months of compensatory education services.  Accordingly, I find that a 25 percent reduction in the lodestar is warranted and Plaintiffs are entitled to $70,320.00 in reasonable attorney's fees and $468.12 in recoverable costs.[13]  *See Combs v. City of Huntington*, 829 F.3d 388, 395 (5th Cir. 2016) (Where "the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.") (quoting *Hensley*, 461 U.S. at 437); *Caldwell Indep. Sch. Dist. v. L.P.*, 994 F. Supp. 2d 811, 822–23 (W.D. Tex. 2012) ("[T]he Court finds [the lodestar] should be reduced by 25%, because [the plaintiff] argued for denial of a free appropriate education as to two years before the hearings officer, but the officer found only one year had been denied.

---

[13] Plaintiffs requested $1,247.36 in recoverable costs but included expenses for meals, travel, and lodging.  *See* Dkt. 16-2 at 6.  The Supreme Court has held that recoverable costs under the IDEA are limited to those "set out in 28 U.S.C. § 1920, the general statute governing the taxation of costs in federal court."  *Murphy*, 548 U.S. 291, 297–98 (2006).  28 U.S.C. § 1920 does not list costs associated with meals, travel, or lodging.  Consequently, I find that Plaintiffs should not be awarded the $779.24 associated with these expenses.  *See id.* at 297 (The use of the term *costs* rather than *expenses* "strongly suggests that § 1415(i)(3)(B) was not meant to be an open-ended provision that makes participating States liable for all expenses incurred by prevailing parents in connection with an IDEA case—for example, travel and lodging expenses or lost wages due to time taken off from work.").

Nevertheless, no further reduction is necessary, because [the plaintiff] was successful on most other grounds.").

## CONCLUSION

Because I find that a preponderance of the evidence supports the hearing officer's decision, I **RECOMMEND** that Plaintiffs' Motion for Judgment Affirming the Hearing Officer and for Attorney's Fees (Dkt. 16) be **GRANTED**, Defendant Klein Independent School District's Motion for Summary Judgment (Dkt. 17) be **DENIED**, and Plaintiffs be compensated $70,320.00 in reasonable attorney's fees and $468.12 in recoverable costs.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED in Houston, Texas, this 16th day of March, 2020.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE